**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-2(c)
**WASSERMAN, JURISTA & STOLZ, P.C.**
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Phone: (973) 467-2700
Fax: (973) 467-8126
Co-Counsel for Robert M. Pietrowicz, Creditor
**LEONARD C. WALCZYK**

**FLASTER LAW GROUP**
30 Columbia Turnpike, PO Box 21
Florham Park, NJ 07932
Phone: (973) 822-7900
Fax: (973) 822-7923
Co-Counsel for Robert M. Pietrowicz, Creditor
**NEAL H. FLASTER**

| | |
|---|---|
| In Re : <br><br> **WILLIAM CHARLES HOVEY,** <br><br><br> Debtors. | Chapter 13 <br><br> Case No. 19-28149 <br><br> Honorable Rosemary Gambardella <br><br> **Hearing Date: August 5, 2020, 10:00 a.m.** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF NOTICE OF MOTION *IN LIMINE* TO STRIKE DEBTOR'S VALUATION REPORT**
**AND TO EXCLUDE DEBTOR FROM TESTIFYING**
**AS AN EXPERT OR PROVIDE LAY OPINION TESTIMONY OR EVIDENCE**
**AS TO THE VALUE OF TELEMARK CNC, LLC'S ASSETS**

**TO:    HONORABLE ROSEMARY GAMBARDELLA,**
**UNITED STATES BANKRUPTCY JUDGE**

**ROBERT M. PIETROWICZ,** creditor herein, submits the within Memorandum in

support of the Creditor's Notice of Motion *In Limine* to exclude Debtor William Charles Hovey

from *inter alia*, providing expert or lay opinion testimony as to the value of Telemark CNC, LLC's assets subject to levy and auction sale in connection with Debtor's Notice of Motion to Reduce Claims of Creditor, Robert M. Pietrowicz [See, Docket Nos. 33 and 35].

## A.    PRELIMINARY STATEMENT

Debtor, William C. Hovey ("Debtor") and Creditor, Robert M. Pietrowicz ("Creditor" or "Pietrowicz") were former business partners in a limited liability company known as Telemark Holdings, LLC, which was the subject of a lawsuit filed in the Superior Court of New Jersey, Law Division, Morris County under Docket No.: L-796-14. In connection therewith, Judgment was entered in favor of the Creditor on November 16, 2018 in the amount of $512,500.00, which was subsequently amended to include pre and post judgment interest. Debtor acknowledges that the total amount of Creditor's claim as of September 23, 2019 is $583,135.72.

Creditor Pietrowicz now moves by Notice of Motion *in Limine* to exclude the Debtor from testifying as an expert witness pursuant to Federal Rule of Evidence 702 ("**FRE 702**) and/or giving lay opinion testimony pursuant to Federal Rule of Evidence 701 ("**FRE 701**") as to the value of the assets of Telemark CNC, LLC ("Telemark CNC") levied on and sold to Creditor at the pre-petition Sheriff's sale held on August 16, 2019. Creditor Pietrowicz also moves to strike Debtor's valuation report filed with the Court on May 4, 2020 [Docket No.51] in support of his objection to the Claim of Creditor Pietrowicz [claim no. 5-1].

Although the Debtor could have retained the services of a third party appraiser to provide an expert opinion as to Telemark CNC's assets, he elected instead to provide his own valuation report despite being unqualified. Debtor now makes the outrageous claim in his report that Telemark CNC's assets were worth $1,440,055.00 at *fair market value* and that after he is credited

with this amount, Creditor Pietrowicz must pay him over $800,000.00 as a surplus credit. This valuation is specious on its face and made in bad faith by Debtor to coerce payment from the Creditor or to avoid payout to him in Debtor's Chapter 13 bankruptcy.

In Debtor's report filed on May 4, 2020, he claims that his valuation was prepared in accordance with the standards set by the Uniform Standards of Professional Appraisal Practices (USPAP). However, the USPAP requires that persons making their valuation/appraisal do so without any bias, advocacy or self-dealing. The appraiser is required to act at all times with impartiality and objectivity and is required to comply with the USPAP record keeping and ethics rules. Despite same, the Debtor violated the USPAP rule requirements by *inter alia*, failing to maintain records as required and submitting a valuation report replete with conclusions based on Debtor's bias, self-interest, and self-advocacy with the intent to mislead the Court in the Debtor's Chapter 13 proceeding.

Debtor's misrepresentations of fact in his valuation report, specifically his claim that Creditor Pietrowicz improperly vandalized, damaged and removed Telemark CNC's contents after taking possession of the premises on September 4, 2019 completely ignores the fact that not only was title to all of Telemark CNC's contents and assets transferred to the Creditor by the levy and Sheriff's sale on August 16, 2019, the Creditor's access to Telemark CNC's premises on September 4, 2019 was expressly permitted by Order to Show Cause entered on August 30, 2019 in the Superior Court of New Jersey, Law Division, Morris County. Specifically, by the terms of the Order to Show Cause, which was made permanent by Order entered on September 11, 2019, Creditor was granted access to Telemark CNC's premises (to the Debtor's exclusion) to prepare and remove the machinery, equipment and other contents that he owned for purpose of sale or transfer, as a result of the levy and Sheriff's sale.

For the reasons set forth below, Debtor is not qualified to testify as an expert or provide lay opinion testimony under the Federal Rules of Evidence. Thus, his bogus valuation of Telemark CNC's assets to compel/coerce Mr. Pietrowicz to compensate him for a non-existent surplus should be rejected by this Court on Creditor's Motion.

## A. STATEMENT OF FACTS AND PROCEDURAL HISTORY.

Debtor elected not to retain an independent expert to conduct a valuation of Telemark CNC's assets subject to the levy and auction conducted by the Morris County Sheriff's Office on August 16, 2019. (See Paragraph 3, Certification of Neal H. Flaster, Esq., dated July 9, 2020). Instead, the Debtor prepared and filed his own report valuing the assets in question in what the Debtor claims *inter alia,* is based on his own experience and consultations and communications with various sources and individuals beyond the scope of his personal knowledge. However, Debtor failed to include any documentation annexed to his report corroborating his alleged consultations/communications with other persons or companies.

Although the Debtor claims in his report that the machinery and equipment sold to Creditor Pietrowicz at the August 16, 2019 Sheriff's sale was in "proper operating condition", he submitted no written proof documenting any inspections on his part. (See Paragraph 3, Certification of Neal H. Flaster, Esq., dated July 9, 2020) Nor were there any documents submitted by Debtor with his report corroborating his claim that the Sheriff's Office confirmed that all machines and equipment were in good working order at the time of the levy and sale on August 16, 2019.

On May 15, 2020, the Debtor was deposed to inquire, among other things, as to: a) the methodology he employed in his valuation report; and b) based on his *curriculum vitae,* the extent of his experience and knowledge which qualified him to testify as an expert or give lay opinion

testimony. A true copy of the deposition mini transcript is annexed to Certification of Counsel as Exhibit "D". (See Exhibit D, annexed to the Certification of Neal H. Flaster, Esq., dated July 9, 2020). At the Debtor's deposition, when asked why he chose to value Telemark CNC's assets sold at the Sheriff's Sale at "fair market value", he stated: "I chose fair market value because at the time that this appraisal is representing, the equipment was in proper operating condition and I chose to market -- excuse me, to appraise it at fair market value to represent the fair value of the equipment." (See Paragraph 5, Certification of Neal H. Flaster, Esq., dated July 9, 2020; see also, Transcript at page 23, line 20 through page 24, line 2). When asked why he chose not to bid at the Sheriff's sale on Telemark CNC's contents, the Debtor stated that: "That's personal reasons. I -- I -- you know, limited funds. There is a lot of reasons. Emotional. I don't have a clear answer for you on that one. I'm not even sure". (See Paragraph 6, Certification of Neal H. Flaster, Esq., dated July 9, 2020). (See also, Transcript at page 24, line 19 through page 25, line 5).

When the Debtor was questioned at his deposition whether he took any legal action in the Courts to stop the sale of Telemark CNC's contents after the Sheriff's Office refused to grant an adjournment, he responded, stating "I don't recall." (See Paragraph 7, Certification of Neal H. Flaster, Esq., dated July 9, 2020) (See also, Transcript at page 26 lines 9 through 18). Notwithstanding Debtor's testimony, this Court should be aware that on July 31, 2019, just two weeks prior to the date of the Sheriff's sale, Debtor filed an emergent application before the Superior Court of New Jersey, Appellate Division under Docket No.: A-003832-18 for leave to file an emergent appeal to *inter alia*, vacate the November 16, 2019 Judgment against him individually and Telemark CNC (See Exhibit E, annexed to the Certification of Neal H. Flaster, Esq., dated July 9, 2020). On August 1, 2019, the Appellate Division rejected Debtor's emergent application, stating that: 1) the timing of the application suggested that the emergency was self-

generated; and 2) Defendants (e.g., Hovey and Telemark CNC) were unlikely to demonstrate that they were entitled to obtain injunctive relief (See Exhibit F, annexed to the Certification of Neal H. Flaster, Esq., dated July 9, 2020).

During the course of the Debtor's deposition testimony, numerous questions were asked of him about his experience in valuing various machinery and equipment. For example, when asked whether the Debtor attended auction sales to buy equipment when he was operating Telemark CNC, he stated that he did not recall ever buying equipment or machines at an auction sale while Telemark CNC was in business. (See Paragraph 10, Certification of Neal H. Flaster, Esq., dated July 9, 2020) (See also, Transcript page 31 lines 1 through 9). When asked whether he recalled going to auction sales to buy machinery and equipment for Telemark CNC for significantly less than fair market value, Debtor stated: "I don't recall." (See Paragraph 10, Certification of Neal H. Flaster, Esq., dated July 9, 2020). The Debtor also testified that he did not recall ever paying more than fair market value for machinery and equipment at an auction sale. (See Paragraph 10, Certification of Neal H. Flaster, Esq., dated July 9, 2020).

During his deposition testimony, Debtor acknowledged that when he was in business with Creditor Pietrowicz (in connection with their jointly owned company, Telemark Holdings, LLC which was a party to the state court action), he recalled going to auction sales with Mr. Pietrowicz to buy machinery and equipment. (See Paragraph 10, Certification of Neal H. Flaster, Esq., dated July 9, 2020). However, he could not recall whether he purchased machinery and equipment at these sales for (significantly) less than fair market value. (See Paragraph 10, Certification of Neal H. Flaster, Esq., dated July 9, 2020) (See also, Transcript page 31, lines 1 through 25 to page 32, lines 1 through 5).

When asked about the significance of the term, "Six Sigma Certification" referenced on multiple occasions in the Debtor's Curriculum Vitae (See Exhibit B, annexed to the Certification of Neal H. Flaster, Esq., dated July 9, 2020), Debtor testified that this certification was awarded following fourteen months of training for engineers and operational personnel in advanced statistics, applied statistics, and problem solving. (See Paragraph 11, Certification of Neal H. Flaster, Esq., dated July 9, 2020) (See also, Transcript, Page 34, lines 9 through 25). Debtor failed however, to demonstrate any nexus between the type of training required to obtain a Six Sigma Certification and the training and experience associated with learning how to conduct appraisals and valuations of machinery, equipment, parts, materials, inventory, or other business assets.

When the Debtor was asked at his deposition about the reference in his Curriculum Vitae, to his providing consultations to executives as to the valuation of factory and engineering computer systems, machines and equipment and for acquisition purposes, he acknowledged that none of the alleged "valuation consultations" were attached as exhibits to his report. (See Paragraph 12, Certification of Neal H. Flaster, Esq., dated July 9, 2020 see also, Transcript, Page 34, lines 9 through 25). Nor could Debtor provide the names of the companies and dates of his alleged valuation consultations. (See Paragraph 14, Certification of Neal H. Flaster, Esq., dated July 9, 2020; see also, Transcript page 42, lines 3 through 1).

When the Debtor was asked at his deposition whether he was certified as an appraiser, he admitted that he had no such certification and could not recall taking any classes in appraisals.(See Paragraph 13, Certification of Neal H. Flaster, Esq., dated July 9, 2020; see also, Transcript page 40, line 18 through page 41, line 15). When the Debtor was asked about his claim that "all operations, equipment, machines at the premises of Telemark CNC were fully functional and operational in the normal course of business without restrictions" [see page 2 of appraisal report

annexed to Certification of Counsel as Exhibit A] and whether he had documentation to substantiate this allegation, he denied having same. (See Paragraph 16, Certification of Neal H. Flaster, Esq., dated July 9, 2020; see also, Transcript page 50, line 20 through page 51, line 8).

The Debtor admitted at his deposition that although he cited in his valuation report to the USPAP ("Uniform Standards of Professional Appraisal Practice") guidelines in valuing Telemark CNC's assets, he could not recall the specific guidelines that he relied upon and was not able to cite to any specific USPAP reference number or code number in support of his claim. (See Paragraph 17, Certification of Neal H. Flaster, Esq., dated July 9, 2020; see also, Transcript, Page 71, line 2 through page 72, line 15). When the Debtor was asked why he never solicited offers to sell his business assets to satisfy Creditor's judgment which would allow him to keep the balance of the sale proceeds for himself, he states there was a court order barring the sale. (See Paragraphs 28 and 29, Certification of Neal H. Flaster, Esq., dated July 9, 2020; see also Transcript page 244, line 10 through page 245, line 22). However, the Debtor could not identify any specific Order in the underlying state court litigation which prevented him from satisfying his judgment debt from the sale proceeds of Telemark CNC. (See Paragraph 29, Certification of Neal H. Flaster, Esq., dated July 9, 2020; Transcript page 248, lines 5 through 20).

## B.     LEGAL ARGUMENT

### 1.     DEBTOR'S SELF-SERVING VALUATION REPORT CLAIMING THAT HE IS ENTITLED TO A CREDIT FOR LEVIED ASSETS SOLD AT AN EXECUTION SALE AND FOR PAYMENT OF SURPLUS FROM CREDITOR PIETROWICZ IS GREATLY OVERSTATED AND SHOULD BE EXCLUDED.

In Debtor's Claim Objection, he contends that he is entitled to a ***fair market*** credit as a result of the August 16, 2019 Sheriff's sale of Telemark CNC's assets. For the reasons set forth *infra,* Debtor's use of an improper valuation methodology to create a fictitious liability on the part

of the Creditor to pay a surplus of over $800,000 is simply a ruse on Debtor's part motivated by his bias and self-interest to coerce payment from the Creditor, which is not supported by any reasonable interpretation of the law.

In Smith v. Lopez, 304 N.J. Super 26 (Ch. Div. 1996), the trial court held that in calculating the credit due following a Sheriff's sale of the judgment debtor's assets, the credit would be limited to the distressed sale price and not fair market value where the sale was made to a third party in a commercially reasonable manner. In Smith, *supra*, the judgment debtor's motor vehicle was sold at a Sheriff's Sale in connection with the execution of a judgment which required the debtor to pay his ex-wife child support arrears and other debt. The Court held that the debtor's credit against the judgment was not limited to the $100.00 Sheriff's Sale price since the Court believed that the Sheriff's Sale was a sham, as the ex-wife's attorney, as sole bidder, purchased the automobile for less than 2% of its value. If allowed to stand, the Court held that restricting the debtor to a $100.00 credit would provide the ex-wife with a double recovery and permit her to obtain the automobile and then resell it, while suffering virtually no reduction in the judgment debt.

Thus, when the ex-wife, in her capacity as an unsecured judgment creditor, took ownership of the judgment debtor's automobile at the Sheriff's Sale in the course of executing on her judgment, the debtor was not entitled to fair market value of the car as credit against the judgment. Rather, the debtor's credit was limited to the distressed sale price that the ex-wife obtained following the subsequent sale of the car to an auto dealer. In Smith, *supra*, the Court found that fair market value did not represent the car's worth to the seller in distress as the ex-wife's sale of the vehicle was conducted fairly and the price obtained was reasonable under the circumstances, holding that:

> [t]he Court concludes that plaintiff's sale of the vehicle was conducted fairly, and under the circumstances, the price obtained was reasonable. Defendant cannot be heard to complain. ***After all, he had the option, before execution of the judgment, to sell the vehicle for fair market value which he purports and satisfy the judgment. Instead, he chose to ignore the judgment, placing plaintiff in the distress situation that required her to execute on this property and obtain whatever money she could.*** <u>Smith</u>, supra. at 34.

In applying <u>Smith</u> to the case at bar, Debtor's purported "fair market valuation" begs the ultimate question: "if the Debtor believed the levied assets were truly worth $1.3 million, why didn't he simply sell the assets prior to levy, pay off Creditor Pietrowicz's judgment, and pocket the difference?" Although the Debtor could have sold Telemark CNC's assets to satisfy Creditor Pietrowicz's judgment, he elected to continue operating in place as if the Sheriff's sale transferring ownership of Telemark CNC's assets to Creditor Pietrowicz never occurred, while keeping the fruits of his labor for himself. He operated in this manner from November 16, 2018, the date the Order of Judgment was entered until he was excluded from the premises by Order to Show Cause with Temporary Restraints dated August 30, 2019, which allowed the Creditor access inside Telemark CNC to prepare the machines and equipment to be sold or moved.

Here, Debtor's assertion that he is entitled to a fair-market credit and a surplus refund based on his interpretation of "fair market valuation" is contrary to the holding in <u>Smith</u>, *supra* and the line of cases that followed. See, <u>MMU of New York, Inc. v. Greiser</u>, 415 N.J. Super. 37 (App. Div. 2020), which the Debtor heavily relies upon in his claim objection, wherein the Court recognized the inherent equitable authority of a court to provide the judgment debtor with a credit for either the property's fair market value, if the property was retained by the judgment creditor or the amount realized by the judgment creditor in a sale of property to a third party to preclude unjust enrichment in the form of a windfall or double authority, even in the absence of express

statutory authorization. The holding in Smith was subsequently cited with approval in at least two other unreported decisions in New Jersey, Romeo v. KNK Interiors, 2008 WL 960414 (Law Div. 2008) and In re Eckert, 2007 WL 3243922 (D.N.J. 2007) (discussing definition of "commercial reasonableness" as it applies to disposition of property).

In opposing Debtor's claim that he is entitled to a fair-market credit and therefore, a surplus refund of over $800,000.00, Creditor Pietrowicz filed the Declaration of Alan Atkins [Docket entry no. 47], a highly-regarded, experienced and credible appraiser who is well-known to the Bankruptcy Courts in New Jersey. In Mr. Atkins' report, he valued Telemark CNC's assets subject to levy and execution sale consistent with the value received from the "commercially reasonable sale" of the contents to third parties. See Auction Notes annexed as exhibits to the Atkins Declaration. See also, Creditor Pietrowicz's Certification dated July 10, 2020, with exhibits setting forth in detail the sales of Telemark CNC's contents subject to levy and auction sale by the Sheriff's Office on August 16, 2019. The Atkins report confirmed the value of the liquidated, levied assets at issue, establishing $61,740.00 as the amount of the credit the Debtor should receive against Mr. Pietrowicz's judgment as a result of his appraisal of assets visible to him in his inspection and other assets previously sold based on his observation of photographs taken at the inventory conducted by the Sheriff's Office. Thus, Creditor Pietrowicz' filed claim [claim no 5-1] in the amount of $583,135.72 (including post judgment interest accruing prior to the date Debtor filed for bankruptcy) would be reduced to $521,395.72.

After applying the credit of $61,740.00 to the judgment liability, the Debtor is ineligible to proceed pursuant to Chapter 13 as he exceeds the debt limit for Chapter 13 eligibility under 11 U.S.C. Section 109(e). This debt was liquidated and non-contingent, as established by the Superior Court judgment entered on November 16, 2018, with the levy and execution sale having

taken place prior to Debtor's filing for bankruptcy on September 24, 2019. Although, the Debtor may dispute the amount of the credit he receives for the value of the levied assets, his claim has no bearing on his Chapter 13 eligibility calculation.

In a bad faith attempt to "cure" his statutory Chapter 13 ineligibility, the Debtor has now conjured up a bogus "appraisal" of the levied assets [Docket No. 51][1] valuing the subject assets at over $1.4 million. Contemporaneously with this filing, the Debtor demanded that Creditor Pietrowicz pay him $800,000 in surplus monies. Creditor now moves by Motion to strike Debtor's valuation report and to exclude all testimony by the Debtor as a purported "expert" witness under **FRE 702** and/or by lay opinion testimony under **FRE 701** as to the value of Telemark CNC's assets subject to levy and Sheriff's sale.

Although the Federal Rules of Evidence do not specifically provide for a motion *in limine,* it is well settled law that courts consider and rule on motions *in limine* prior to testimony in a contested subject area. Specifically, **FRE 104(a)** provides that as to "Questions of Admissibility, Generally," "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b).

In making its determination, the Court is vested with broad inherent authority to manage its cases, which carries with it the discretion and authority to rule on motions *in limine* prior to trial. See, <u>Luce v. United States,</u> 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984); <u>In re Japanese Elec. Prods. Antitrust Litig.,</u> 723 F.2d 238, 260 (3d Cir. 1983), rev'd on other grounds sub nom., <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,</u> 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (the court exercises its discretion to rule *in limine* on evidentiary issues "in

---

[1] See copy annexed as Exhibit A to the Certification of Counsel submitted herewith.

appropriate cases"). Courts may exercise this discretion to ensure that juries are not exposed to unfairly prejudicial, confusing or irrelevant evidence. <u>United States v. Romano,</u> 849 F.2d 812, 815 (3d Cir. 1988). Courts may also do so to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." <u>Bradley v. Pittsburgh Bd. of Educ.</u>, 913 F.2d 1064, 1069 (3d Cir. 1990) (citations omitted).

**2.    AS THE DEBTOR FAILS TO QUALIFY AS AN EXPERT WITNESS PURSUANT TO FEDERAL RULES OF EVIDENCE 702 AND 703, HIS VALUATION REPORT SHOULD BE STRICKEN AND HIS TESTIMONY BARRED**.

In connection with this Court's preliminary determination, the Debtor is  not qualified to act as his own expert and his valuation "report" is not an expert report within the proper scope of **FRE 702** and **FRE 703.**  Specifically, **FRE 702** provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principals and methods, and (3) the witness has applied the principals and methods reliably to the facts of the case.

As set forth herein, the valuation report and testimony offered by the Debtor:

a.    Will *not* assist the trier of fact;

b.    Is *not* submitted by a witness qualified as an expert by knowledge, skill, experience, training *or* education;

c.    Is not based upon sufficient *facts* or *data*;

d.    Is not the product of *reliable* principals and methods; and

e.    Does *not* apply principals and methods *reliably* to the facts of the case.

**FRE 703** provides:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied

upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Debtor's valuation "report" (as confirmed by his recent deposition testimony) has no probative value and will not assist the trier of fact with respect to valuation of the subject property in issue, as required by **FRE 702 and 703**. However, should this Court find that the Debtor has sufficient expertise, **FRE 403** precludes the Debtor from offering an expert opinion because the probative value of his testimony is substantially outweighed by other factors under this rule:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue waste of time, or needless presentation of cumulative evidence.

## I.  THE PROPER DETERMINATION OF EXPERTISE

### *PART ONE-FRYE-1923*

In 1923, the admissibility of a polygraph test was evaluated by U. S. Supreme Court and found to be lacking.  In Frye v. U.S., 293 F. 1013, 34 ALR 145 (App. D.C. 1923) (overruling recognized by In re Joint Eastern and Southern District Asbestos Litigation, 827 F. Supp. 1014 (S.D.N.Y 1993) and (overruling recognized by U.S. v. Minnis, 26 F. 3d 134 (9th Circuit 1994), the Court granted admissibility of proffered scientific evidence in a reliability analysis.  The Court reasoned:

…while courts will go a long way in admitting expert testimony deduced from well recognized scientific principles or discovery, the thing from which the deduction is made must be *sufficiently*

> *established to have gained general acceptance in a particular field*
> *in which it belongs.* <u>Frye</u>, 293 F. 1013, at 1014 (emphasis added).

After hundreds of reported cases, the Federal Courts added that the rationale behind the <u>Frye</u> reliability analysis is "…assurance that those most qualified to assess the general validity of a scientific method will have the determinative voice." <u>U.S. v. Addison</u>, 498 F. 2d 741, 744 (D.C. Cir. 1974). <u>Frye's</u> "general acceptance" test was superseded by the adoption of the Federal Rules of Evidence. Nothing in the Rules as a whole or in the text and drafting history of **FRE 702** which specifically governs expert testimony, gives any indication that "general acceptance" is a necessary precondition to the admissibility of the scientific evidence. Faced with a proffer of expert testimony under **FRE 702**, the trial judge, pursuant to **FRE 104(a)**, must make a preliminary assessment whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue to be admissible.

### *PART TWO- DAUBERT-1993*

In June 1993, the issue of scientific evidence in the Courts took on a new and important dimension. In an opinion marked as much by its brevity as by its impact, the Supreme Court brought the foundational requirements for science in the courts into the 21st Century. In <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d. 469 (1993), the Court held that:

> …the trial judge must ensure that any and all scientific testimony
> or evidence admitted *is not only relevant but reliable.* <u>Daubert v.</u>
> <u>Merrell Dow Pharmaceuticals</u> 113 S.Ct. at 2786, 2795, 125 L. Ed.
> 2d 469 at 480 (1993).

Because experts are permitted wide latitude in their opinions and are not required to base their pronouncements on first-hand knowledge, the Court requires that ***"the expert's opinion must have a reliable basis in the knowledge and the experience of his discipline."*** <u>Daubert v. Merrell</u>

<u>Dow Pharmaceuticals</u>, 113 S. Ct. 2786 at 2796, 125 L. Ed. 2d 469, at 482 (1993). In this analysis, courts are required to excuse proposed experts who do not have a grasp of the "knowledge and experience of [their] discipline."

Compared to lay witnesses, experts purport to offer testimony that is scientific. The Court indicated that by using the term "scientific", the witness implies a "grounding in the methods and procedures of science." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469, 481 (1993). The word "knowledge" the Court instructed, "connotes more than subjective belief or unsupported speculation." <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469, 481 (1993). The Court made it clear that:

> …in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation-*i.e.*, 'good grounds', based on what is known. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469, 481 (1993).

Basing its rule as to admissibility on reasoning and methodology, the Court quoted from a learned treatise, stating that: "[s]cientific methodology today is based on generating hypothesis and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 113 S. Ct. 2786, 2796, 125 L. Ed. 2d 469, 43 (1993).

The Court instructed that there is now "Key Question" which must be answered:

> …whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) *tested*…(Emphasis added.) <u>Daubert v. Merrell Dow Pharmaceuticals</u> , 113 S. Ct. 2786, 2795, 2796, 125 L. Ed. 2d 469, 482-3 (1993).

The Court's instruction to the trial courts was that when "expert," "scientific" testimony is offered:

> …the trial judge must determine at the outset, pursuant to FRE 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *This entails a preliminary assessment* of whether the reasoning or methodology underlying the testimony is *scientifically valid* and whether that reasoning or methodology properly can be applied to the facts in issue. <u>Daubert v. Dow Pharmaceuticals</u>, 113 S. Ct. 2786, 2795, 2796, 125 L. Ed. 2d 469, 482 (1993).

Emphasizing that the "focus…. must be solely on principles and methodology," <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 113 S. Ct. 2786, 2797, 125 L. Ed. 2d 469, 484 (1993), the Court's analysis cites to <u>U.S. v. Smith</u>, 869 F. 2d 348, 27 Fed. R. Evid. Serv. 938 (7th Cir. 1989), and informs that the "error rate" in the predictions and techniques espoused in the opinions of the experts must be considered. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 113 S. Ct. 2786, 2797, 125 L. Ed. 469, 483 (1993).

Grounding its admissibility analysis in the principles and methodology of science, the Court held:

> ….that scientists typically distinguish between 'validity' (does the principle supports what it purports to show?) and 'reliability' (does application of the principle produce consistent results?)….our reference here is to *evidentiary* reliability—that is, trustworthiness….In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 113 S. Ct. 2786. 2795, 125 L. Ed. 469, 481 (1993) (footnote 9, emphasis in original.)

### *PART THREE – KUMHO TIRE CO., LTD.*

While <u>Daubert</u> represents the Supreme Court's position with respect to science, evidentiary reliability, and admissibility, in a decision widely hailed as the tombstone for junk

science in the courtroom, the Court in <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1991), simply held:

> "<u>Daubert</u>…applies to all expert testimony."  <u>Kumho Tire Co., Ltd.</u>
> <u>v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167, 1174, (1999).

Writing for the Court, Mr. Justice Breyer relied heavily upon Justice Brennan's elegant <u>Daubert</u> analysis.  The key feature of <u>Kumho Tire</u> is its addressing a subjective analysis by an expert of a critical facet in the case.  <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167 1174, (1999).  As is so often seen with "experts" like what the Debtor purports to be, the expert witness in <u>Kumho Tire</u> testified that his subjective and experience-based methodology was accurate.  Piercing this veil, Justice Breyer wrote:

> Carlson himself claimed that his method was accurate… nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167, 1179 (1999) (citations omitted).

In the underlying litigation in <u>Kumho Tire Co., Ltd. v. Carmichael</u>, the trial court properly acted as a <u>Daubert</u>-type "gatekeeper" even though the expert's testimony was characterized as technical rather than scientific. In his role as a gatekeeper, the trial judge examined the expert's methodology, the reliability-related factors required by <u>Daubert,</u> the theory's "testability", peer review or publication and rates of error prior to refusing to allow the expert's testimony to be presented to the jury. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167, 1173, 143 L. Ed. 2d 238 (1999). Although the <u>Kumho Tire</u> plaintiffs argued that the court's application of the <u>Daubert</u> factors was "inflexible", the Eleventh Circuit reversed.  The Supreme Court granted certiorari because of the uncertainty among the lower courts about whether, or how, <u>Daubert</u> applied to expert testimony as to "technical" or "other specialized knowledge" that is not

"scientific" in a laboratory sense. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167, 1173, 143 L. Ed. 2d 238 (1999)

On appeal, the Supreme Court reiterated its position that the trial judge must undertake the "gatekeeping obligation" as Federal Rules 702 and 703 grant expert witnesses latitude unavailable to other witnesses. Quoting from Judge Learned Hand in Hand, "Historical and Practical Considerations Regarding Expert Testimony", 15 Harv. L.Rev. 40, 54 (1901), Justice Breyer explained that experts of all kinds tie observations to conclusions through the use of "general truths derived from….specialized experience." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999). To meet the validity and reliability challenge, Justice Breyer instructed:

> <u>Daubert's</u> list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999).

The key concepts of <u>Kumho Tire</u> can be summarized as follows:

- The *TRIAL COURTS* must determine both the validity of the expert's qualifications *and* the reliability of the proposed testimony. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526, U.S. 137, 119 S. Ct. 1167, 1176-1177, 143 L. Ed. 2d 238 (1999).

- *EXPERTS* must demonstrate a valid connection to the pertinent facts as a precondition to admissibility. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 167, 1174, 143 L. Ed. 2d 238 (1999).

## II.  APPLICATION OF <u>DAUBERT</u> & <u>KUMHO TIRE</u><br>TO THE PROPOSED VALUATION TESTIMONY

Creditor Pietrowicz has been provided with and has reviewed the submission of the "appraisal" filed by the Debtor [Docket No. 51] in support of his Claim Objection, annexed as Exhibit "A" to the Certification of Counsel submitted herewith, and has had the opportunity to depose the Debtor regarding same. During the course of the Debtor's sworn deposition testimony, the Debtor's blatant lack of understanding as to the specialized knowledge required of an expert in his valuation of Telemark CNC's assets is staggering. As a consequence, Debtor's self-serving "valuation" report is: a) conclusory; b) not based on sufficient facts or data; c) not the product of reliable principles or methods; and d) the principals and methods used by the Debtor are not applied reliably to the facts of this case and the issues in dispute.

Since the Debtor cannot be qualified as an expert as to valuation by any of the five factors set forth in **FRE 702** based on his lack of knowledge, skill, experience, training or education, his proffered testimony is not "helpful to the trier of fact" and is therefore, subject to exclusion under **FRE 403** on the grounds of unfair prejudice and waste of time.

The specific problems with the Debtor's valuation report and its conclusions are outlined below.

### *As to "qualification and professional experience"*:

Debtor attaches his *curriculum vitae* to his "Appraisal" report, annexed to Certification of Counsel as Exhibit B. Of its three pages, the Debtor's *curriculum vitae* describes the Debtor's limited experience in "valuation" stating that "[w]ithin his career, Mr. Hovey has provided numerous consultations to executives on the valuation of factory and engineering level computer systems, machines and equipment, and has personally provided valuation consultation of business for acquisition purposes." Nonetheless, despite Debtor's claim that these consultations serve as the basis for his qualifying as an expert witness, Debtor's failure to attach copies of the consultations

referenced in his *curriculum vitae* with his report is fatal to his case, as it leaves the Creditor to have to speculate what the substance of those communications were for purposes of Debtor's expertise.

Debtor also fails to set forth in his valuation of Telemark CNC's assets whether he has experience in appraising what is called for in this case, specifically valuation at ***forced sale liquidation value*** of machinery and equipment levied on and sold to Creditor Pietrowicz at the Sheriff's sale. Regardless of the Debtor's obvious motivation and self interest in attempting to employ a broader valuation of Telemark CNC's assets to maximize his claim for a surplus credit, valuation of a business for purposes of *sale* or *procurement* is not what is called for here.

Although the Debtor emphasizes in his *curriculum vitae* annexed hereto as Exhibit B his alleged expertise in having qualified for a Lean Six Sigma Black Belt for purposes of analyzing and implementing manufacturing process, that expertise is completely irrelevant to his expertise in valuing the personal property in issue (e.g., Telemark CNC's assets).[2] Indeed, the Debtor failed to demonstrate in either his *curriculum vitae*, his resume or his valuation report that the Lean Sigma Black Belt qualifications are recognized by any appraisal organizations such as ASA, AAA or ISA and are therefore, relevant to his claims of expertise. Six Sigma, at its core, is a system for eliminating defects in manufacturing as the name itself refers to a statistical model, based on deviations on a bell curve that dictates the number of acceptable defects per million manufacturing steps. Achieving Six Sigma status means that an organization tolerates just 3.4 defects per million steps, insisting that 99.99966% of its products or services are without flaws. Historically, most industrial companies operate between three and four Sigma, making them between 93% and

---

[2] Tennant, Geoff (2001). *SIX SIGMA: SPC and TQM in Manufacturing and Services*. Gower Publishing, Ltd., p 7. ISBN 0-566-08374-4

99.3% defect-free (these figures can vary slightly depending on the statistical model).[3] However, because none of that is related to the required expertise necessary to value Telemark CNC's assets, Debtor's alleged expertise in Lean Six Sigma is neither relevant nor material to the Debtor's pending Objection to Creditor Pietrowicz's claim.

In both the Debtor's *curriculum vitae* and his recent resume obtained in subpoenaed discovery, the Debtor fails to mention **any** valuation or appraisal experience, including valuing personal property at liquidation value and testimony by Debtor as an expert witness in other valuation matters.

Debtor's *curriculum vitae* expressly indicates that the Debtor:

a.    never brokered the sale of used personal property;
b.    has no experience in appraising anything;
c.    has no appraisal credentials recognized by any of the three appraisal organizations (ASA, AAA, or ISA);
d.    shows no appraisal training,
e.    shows no valuation expertise;
f.    shows no expert witness testimony experience; and
g.    only shows general industry knowledge regarding replacement pricing and initial purchase costs for the subject items.

Despite having no accreditation or training in the Uniform Standards of Professional Appraisal Practice (USPAP) listed in the Debtor's *curriculum vitae* or resume, the Debtor asserts that his valuation report complies with USPAP standards. While the lack of appraisal accreditation on Debtor's part may not *per se* affect the Debtor's status under USPAP guidelines, USPAP Advisory Opinion No. 21 annexed as Exhibit I to the Certification of Neal H. Flaster, Esq., dated July 9, 2020, states that: a) an individual is required to comply with USPAP standards when either the service or the appraiser is obligated to comply by law, regulation, agreement with the client or intended users; b) under the Preamble to the USPAP standards, even when not obligated,

---

[3] https://qz.com/work/1635960/whatever-happened-to-six-sigma/

individuals may still choose to comply with USPAP as the ETHICS RULE states that an individual should comply at any time that the individual represents that he or she is performing the service as an appraiser to protect the public trust and confidence; c) an ethical obligation to comply with USPAP is created by choice, that is, by choosing to represent oneself as an appraiser; d) an individual acting as an appraiser is expected to provide the service in a manner that is independent, impartial, and objective, consistent with the ethical requirements within USPAP. Thus, once the Debtor acknowledged in his valuation report that it was prepared in compliance with USPAP standards, his failure to comply with those standards renders his conclusions null and void.

For example, the USPAP Ethics rule specifically requires that an appraiser (and any individual representing that he/she is performing the service of an appraiser) is required to comply with multiple conditions imposed in connection his/her conduct. These include but are not limited to the following:

a.     An appraiser must perform assignments with impartiality, objectivity and independence and without accommodation of personal interests;

b.     An appraiser must not perform an assignment with bias;

c.     An appraiser must not advocate the cause or interest of any party or issue;

d.     An appraiser must not agree to perform an assignment that includes the reporting of predetermined opinions and conclusion;

e.     An appraiser must not misrepresent his or her role when providing valuation services that are outside of appraisal practice;

f.     An appraiser must not communicate assignment results with the intent to mislead or to defraud;

g.     An appraiser must not use or communicate a report or assignment results known by the appraiser to be misleading or fraudulent;

> h. An appraiser must not engage in criminal conduct;
>
> i. An appraiser must not willfully or knowingly violate the requirements of the Record Keeping Rule; and
>
> j. An appraiser must not perform an assignment in a grossly negligent manner.

See, Exhibit G, page 7 and Exhibit H, annexed to the Certification of Neal H. Flaster, Esq., dated July 9, 2020.

Debtor attaches what purports to be a certification (at page 7 of his "appraisal") that does not comply with USPAP standards in the following respects:

> (a) The Debtor's opinion is not based upon his unbiased analysis;
> (b) The Debtor does not state that he has no present or prospective interest in the property;
> (c) The Debtor does not certify that the appraisal is done according to USPAP standards; and
> (d) The Debtor does not certify that he has no personal interest or bias with respect to the parties involved.

Unlike the Debtor, the Creditor's valuation expert, Alan Atkins, correctly certified that his valuation opinion is unbiased, that he had no present or prospective interest in the property, that his appraisal was done according to USPAP standards, and that he had no personal interest or bias with respect to the parties involved. However, the Debtor elected not to incorporate similar language in his valuation report because he could do so without facing further consequences as a result of his filing a false certification. In fact, it is uncontroverted that he has a present or prospective interest in the subject property, and that he has a personal interest, bias and/or animosity with respect to Creditor Pietrowicz. Because the absence of this critical language in the Debtor's certification annexed to his report renders his report non-compliant with USPAP standards, the Debtor's valuation report should be stricken for not satisfying the conditions required by the USPAP which he acknowledged being bound by in his report.

### As to understanding of the subject matter and purposes of
### the appraisal and methodologies used:

On page 2 of his valuation report, Debtor describes the scope of his analysis, stating that: "[t]he enclosed is a summary Fair Market Value appraisal report that has been prepared in accordance with USPAP guidelines." On page 3 of his report, the Debtor describes his Fair Market Valuation Methodology, stating that: "[t]he appraisal methodology used herein is that of "Fair Market Value" in accordance with USPAP guidelines for "Fair Market Valuation for "Continued Use" in accordance with the ASA (American Society of Appraisers) guidelines for Valuing Machinery and Equipment, were [*sic*] also taken into consideration."

According to the USPAP, "Appraisers are cautioned to identify the exact definition of market value, and its authority, applicable in each appraisal completed for the purpose of market value."[4] In actuality, there is ***no*** universal definition for "fair market value" and the definition of "fair market value" varies slightly throughout the Internal Revenue Code and among other federal statutory laws in the United States including bankruptcy, state laws and several regulatory bodies. Because the definition is so nebulous, "fair market value" is often decided on a case-by-case basis in many jurisdictions. The definition of "Fair Market Value" in US tax law can be found in Treasury Regulation Sections 1.170A-1(c)(2) and 20.2031-1(b) as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."

This is a task that is so subjective, involving psychological and intangible aspects of the market for the subject property to which the Debtor attempts to apply scientific methodology. Although Telemark CNC's assets were used and in poor condition, the Debtor sought to improperly and artificially boost the value of these assets by including within his report a Market

---

[4] 2016-2017 Uniform Standards of Professional Appraisal Practice, Page 4, lines 104-105.

Analysis of the Precision Machine Products industry which contemplates marketing and sale of the subject assets as part of a turn-key, going concern. This form of analysis involving **specialized knowledge** on the part of the Debtor is not germane to the August 16, 2019 Sheriff's sale auctioning the assets of Telemark CNC to Creditor Pietrowicz.

Although the Debtor claims in his report that all of Telemark CNC machines and equipment were operating, in good working order and some were better than "new" while he was in control of Telemark CNC, he provides no specificity as to the details of his inspections nor did he include documents to corroborate this claim. Debtor's generalization attesting to the condition of Telemark CNC's assets subject to levy, in the absence of written evidence that actual detailed inspections of the machines and equipment took place, suggests that there were either never any inspections or if they occurred, the results were not favorable to the Debtor, otherwise he would have produced them. Debtor's *ipse dixit* declarations as to the condition of Telemark CNC's machines, equipment, etc., while under his control are simply insufficient for this Court to accept in the context of the expert report submitted by Debtor. See, Kumho Tire Co., Ltd., *supra*.

Creditor further submits that if Debtor conducted inspections of Telemark CNC's machinery and equipment, he was required to have produced those records with his valuation report in order to satisfy USPAP standards. If he never inspected Telemark CNC's machinery and equipment and is relying on his generalized knowledge, his testimony is not reliable, does not comply with USPAP standards, and because it is conclusory, it constitutes an impermissible net opinion. In that regard, an appraiser who willfully or knowingly fails to comply with the obligations imposed on him/her by the USPAP record keeping rule, he/she should be considered in violation of the USPAP Ethics Rule. See, Exhibit G, page 10, and Exhibit H. annexed to Certification of Counsel submitted herewith.

In addition, the Debtor used inappropriate criteria in his valuation report for basing his conclusions. For example, on page 5 of his "appraisal" he inserts a Fitted Line Plot chart showing average customer purchase order values for the precision machining industry, which *specialized knowledge* has nothing to do with valuation of specific items of the property at issue (e.g., Telemark CNC's machinery, equipment and other company property). Moreover, the levy and auction at the Sheriff's sale did not encompass the sale of the company as a going concern, including good will, but rather a sale in execution of specific levied items of machinery and equipment in poor used condition and not "new" or "better than new" as Debtor claims in his report. Thus, the Debtor is not qualified to render an expert opinion as to the value of Telemark CNC's assets and therefore, his report should be stricken and his testimony barred.

**3.      SHOULD THIS COURT FIND THAT DEBTOR HOVEY QUALIFIES AS AN EXPERT OVER CREDITOR'S OBJECTION, DEBTOR'S TESTIMONY SHOULD BE BARRED AS A NET OPINION.**

The Third Circuit has explained that **FRE 702** embodies a triology of restrictions on expert testimony: qualification, reliability and fit. <u>Schneider ex rel. Estate of Schneider v. Fried,</u> 320 F. 3d 396, 404 (3d Cir. 2003). Under New Jersey law, an "expert's bare conclusions, unsupported by factual evidence are an inadmissible net opinion. <u>Buckelew v. Grossbard</u>, 87 N.J. 512, 524 (1981). As explained by the New Jersey Superior Court, Appellate Division:

> Under New Jersey law, an expert's opinion must be based on a proper factual foundation. In other words, "expert testimony should not be received if it appears the witness is not in possession of such facts enable him [or her] to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. This prohibition against speculative expert opinion has been labeled by modern courts as the "net opinion rule". Under this doctrine, expert testimony is excluded if it is based merely on unfounded speculation and unquantified possibilities.

Dawson v. Bunker Hill Plaza Associates, 289 N.J. Super. 309 (App. Div. 1996). "The rule frequently focuses on the failure of the expert to explain a causal connection between the act complained of and the injury allegedly resulting therefrom. May v. Atlantic City Hilton, 128 F. Supp. 2d 195, 198 (D.N.J. 2000). Nonetheless, under the Federal Rules of Evidence, the net opinion rule is neither an evidentiary rule nor a factor in the Daubert analysis. Holman Enters. v. Fid. & Guar. Ins. Co., 563 F. Supp 2d 467, 472 n.12 (D.N.J. 2008).

The net opinion rule is merely a restatement of the well settled principle that an expert's bare conclusions are not admissible under **FRE 702**. Zeller v. J.C. Penny Co., No. 05-2546, 2008 U.S. Dist. LEXIS 25993, 2008 WL 906350, at *7 n.13 (D.N.J. Mar. 31, 2008). The net opinion rule requires the expert to give the "why and wherefore" of the opinion rather than a mere conclusion. Curtis v. Besam Group, No. 05-2807, 2007 U.S. Dist. LEXIS 78884, 2008 WL 1732956, at *6. See also, Tentoni v. Jeffers 2011 U.S. Dist. LEXIS 3447. The net opinion rule renders "an expert's bare conclusions, unsupported by factual evidence" inadmissible. May v. Atlantic City Hilton, *supra* at 198. To be admissible as evidence, the expert's opinion must be based on standards accepted by the legal community and not merely on the expert's personal opinion. Stoeckel v. Twp. Of Knowlton, 387 N.J. Super. 1 (App. Div. 2006).

Expert opinions will be stricken as net opinions where they have failed to "give the why and wherefore of their opinion and have provided a mere conclusion." Jimenez v. GNOC Corp., 286 N.J. Super. 533 (App. Div. 1996). The burden of proof is on the proponent of the testimony to prove its admissibility by a preponderance of proof. Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 494 (D.N.J. 2002). See also, Bourjaily v. United States, 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L. Ed. 2d 144 (1987). Under the net opinion rule, an expert's conclusions that are not

supported by factual evidence or other data are forbidden from being admitted into evidence. State v. Townsend, 186 N.J. 473, 494 (2006).

Where the expert's conclusions are based on pure speculation rather than a reasonable inference, the expert opinion is without foundation and therefore, inadmissible. See, Fedorczyk v. Caribbean Cruise Lines, Ltd.. 82 F. 3d 69 (3rd Cir. 1996). Most significantly, an expert opinion is not admissible if the court concludes that an opinion based upon particular facts cannot be grounded on those facts. Id., at 75. In analyzing the net opinion rule's applicability to the facts of the case at bar, if the Debtor's expert opinions did not have a factual basis, then the methodology he employed is either unreliable or did not fit the facts of the case and therefore, his opinion should be stricken. See, Tentoni, *supra*. Thus, to be reliable, an expert's opinion must be "based on the methods and procedures of science" rather than on subjective belief or unsupported speculation. In re Paoli R.R. Yard PCB Litig., 35 F. 3d 717, 741-43 (3rd Cir. 1994). See also, Townsend v. Piere, 221 N.J. 36 (2015) (an expert's conclusion is excluded if it is based merely on unfounded speculation and unquantified possibilities); Buckelew v. Grossbard, 87 N.J. 512, 524 (1981) (an expert's bare conclusions, unsupported by factual evidence or other data, are inadmissible "net opinions"); In Re Yaccarino, 117 N.J. 175, 196 (1989) (experts may rely on their "knowledge, skill, experience, training or education but they may not give a "net opinion" which is one unsupported by any factual evidence or data).

Here, Debtor's report relies on his unilateral  recitation of facts, which he knows or should know are false and/or misleading in substantial part. See examples cited below, where the Debtor falsely mischaracterizes the Creditor's conduct when he took possession of Telemark CNC's premises on September 4, 2019, and then allegedly vandalizing, damaging or removing the same property that he purchased at the Sheriff's Sale on August 16, 2019, with title transferred to him at

that time. Thus, Debtor's claim that Creditor Pietrowicz damaged machinery and equipment that Creditor purchased at the Sheriff's sale and which he was now preparing under of color of law to be removed and/or sold at auction is specious on its face.

Thus, since Debtor's proffered expert testimony does not "fit" within the facts of the case based on the orders and pleadings filed in the underlying state proceedings (See, August 30, 2019 Order to Show Cause with Temporary Restraints and Final Order entered on September 11, 2019), Debtor's report should be stricken and his valuation testimony barred. See, Stephan v. Continental Casualty Ins. Co., 2003 US Dist. LEXIS 7568.

Specifically, the Debtor mischaracterizes the following facts in his valuation report:

a.    Debtor claims that Creditor Pietrowicz gained access to Telemark CNC premises on September 4, 2019 without a court order of possession and destroyed/damaged machines and equipment. Contrary to Debtor's false claims, Plaintiff filed and obtained an Order to Show Cause with Temporary Restraints to the Court, which entered an Order giving Creditor Pietrowicz access to Telemark CNC's premises to prepare the machines and equipment purchased by Mr. Pietrowicz at the Sheriff's sale for removal and/or sale. The temporary restraints were deemed permanent pursuant to Order entered on September 11, 2019 by the Honorable Philip Maenza, J.S.C.

b.    Debtor claims that prior to Creditor Pietrowicz's taking of Telemark CNC's assets, all operations, equipment and machines at Telemark's premises were fully functional and operating in the normal course of business without restrictions. However, Debtor failed to attach to his valuation report a written copy of an inspection of Telemark CNC's machines and equipment corroborating this claim. Debtor's claim as to the condition of Telemark CNC's assets in issue without more fails to satisfy the burden of proof imposed on Debtor, is speculative, constitutes bare conclusions and are not supported by factual evidence.

c.    Debtor claims that Telemark CNC's physical premises was subject twice to inspection by insurance carriers, Department of Defense, and numerous customer inspections and that "every piece of equipment and machinery was clean, fully maintained and operational and organized with shadow boards, with all machinery rebuilt to suburb condition, or new or better than new condition" and that "to that end, Telemark CNC was so successful in its maintenance and rebuild efforts, it advised (an unnamed) Local Machine shop to help establish rebuilding parameters for its equipment." Regardless of the lack of

relevancy of these claims, these allegations are nothing more than bare conclusions unsupported by factual evidence as no proof corroborating same was produced with Debtor's report.

d.    Debtor's narrative labeled "Business Overview" in his report makes multiple representations regarding Telemark CNC and Debtor's qualifications that are irrelevant or immaterial (e.g., Debtor Hovey's "expert consultations to organizations, including other manufacturing companies, and standing members of manufacturing associations regarding Lean Six Sigma awards, including design awards). Debtor failed to make any connection between Telemark CNC and the alleged certificates issued to Mr. Hovey in connection with his participation in "Lean Six Sigma" and design awards relating to his appraisal or valuation experience.

e.    Debtor claims that the appraisal methodology used by Debtor of "Fair Market Value" in accordance with USPAP standards for "in place" replacement and that guidelines for "continued use" was made in accordance with ASA guidelines were taken into consideration in preparation of his report. Debtor's reliance on USPAP standards is not correct as the standards do not support fair market value based on "continued use". Per Debtor's admission, he did not consider "continued use" after August 16, 2019 Sheriff's sale, consistent with his admission that he (allegedly) shut Telemark CNC down after the August 16, 2019 Sheriff's sale.

f.    Debtor claims that he is entitled to a surplus of over $800,000 payable by Creditor Pietrowicz based on his fair market valuation in reliance on the fictitious "continued use" standard for a company that he admitted ceased doing business on August 16, 2019. Debtor failed to apply the rule of law set forth in Smith v. Lopez, supra and M&M of New York v. Greiser, supra, which hold that where the property in issue was sold after purchase at a Sheriff's sale to a third party in a reasonable manner, any credit to judgment debtor is calculated based on distressed liquidation value only, not fair market value (unless property is retained by judgment creditor and not sold).

g.    Debtor claims that his valuation report is made in reliance on USPAP standards. However, this statement is false as the USPAP ETHICS standard requires that any person valuing/appraising property must certify that they are not biased and do not have an interest in the property in dispute. Debtor failed to provide a full and complete certification as required by USPAP because he would have had to disclose that he was biased, had personal animosity toward Creditor Pietrowicz and had a financial stake in the property at issue.

h.    Debtor claims in his report that he consulted with twenty one (21) companies to obtain information and/or to confirm valuation of Telemark CNC's assets. However, Debtor fails to disclose the results of those consultations although he

relied upon same for purposes of his report. In the absence of disclosure as to the contents of those consultations, Debtor's representations as to value constitute "bare" conclusions with no evidentiary basis.

i.      Debtor's certification submitted with his report is inherently contradictory and conclusory, as he claims first that his fair market reported analysis and conclusions are based on his professional opinion arising out of his: a) observations; b) personal business knowledge of the workings of Telemark CNC; c) his forty 40 years of purchasing and selling equipment and machines of the type listed in his report; and then second, from his analysis of similar, like in kind and capability, equipment and machines determined through the collection of data and information from Equipment Dealers and other Purchasing Parties of the same. None of this collection of data and information was included in his report. Nor did the Debtor produce all communications and consultations that he relied upon in rendering an expert opinion from "equipment dealers" and other "purchasing parties". Debtor's subjective interpretation of undisclosed facts not in evidence is conclusory and inadmissible as a net opinion.

j.      Moreover, the certification submitted by the Debtor in support of his valuation is non-compliant with USPAP standards as he cannot certify that he is not biased in his reporting and that he has a self-interest in maximizing the amount of his valuation of Telemark CNC's assets for personal gain.

Thus, Debtor's expert testimony as to liability and damages, et al, including claims to a surplus payable by Creditor, are improperly based on a net opinion and are not admissible for the reasons set forth herein.

## 4.      DEBTOR IS BARRED FROM PROVIDING LAY OPINION TESTIMONY PURSUANT TO FRE 701.

**FRE 701**, entitled "Opinion Testimony by Lay Witnesses" provides that:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understand the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

In 2000, **FRE 701** was amended to add subsection [c] to eliminate the risk that the reliability requirements set forth in **FRE 702** controlling admissibility of expert witness testimony would be evaded through the simple expedient of proffering an expert in law witness "clothing". Under the amendment, the Court is responsible for scrutinizing the proposed witness's testimony to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of **FRE 702**. See generally, Asplundth Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190 (3d Cir. 1995). By channeling testimony that is actually expert testimony to FRE 702, the purpose of this amendment was to ensure that a party will not evade the expert witness disclosure requirements set forth in Fed.R.Civ.P. 26 by simply calling an expert witness in the guise of a layperson. See, Committee Notes on Rules-2000 Amendment.

"Lay opinion testimony is permitted only where the personal knowledge, rational basis, and helpfulness standards of Rule 701 are met and the testimony does not concern scientific, technical, or specialized knowledge reserved for expert witnesses." Salisbury Real Holdings II v. N. Coventry Twp., No. 05-4781, 2006 U.S. Dist. LEXIS 36710, 2006 WL 1555715, at *1 (E.D. Pa. June 2, 2006). The proponent of lay opinion testimony bears the burden of providing an adequate foundation for such testimony and if the testimony fails to meet any one of the three foundational requirements, it should not be permitted. United States v. Fulton, 837 F. 3d 281, 291(3d. Cir. 2016). In layman's terms, the rule is interpreted to mean that a witness is only permitted to give his/her opinion or interpretation of an event when he/she has some personal knowledge of that incident that would allow the witness to "testify to their personal perceptions in the form of inferences or conclusory opinions". Id. However, the rule is carefully designed to exclude lay opinion testimony that "amounts to little more than choosing up sides, or merely tells the jury what result to reach". While opinion testimony that embraces an ultimate issue to be

decided by the trier of fact is not *per se* inadmissible, such testimony is barred when its primary value is to dictate a certain conclusion. Id. Thus, the purpose of the foundation requirements of the federal rules governing lay opinion evidence is to ensure that the testimony does not usurp the fact finder's function. Id.

The Third Circuit has explained the contours of **FRE 701** as follows:

**FRE 701** means that a witness is only permitted to give her opinion or interpretation of an event when she has some personal knowledge of that incident. The objective of such testimony is to put "'the trier of fact in possession of an accurate reproduction of the event.'" In other words, "lay opinion testimony is permitted under **FRE 701** because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." This rule recognizes the reality that "eyewitnesses sometimes find it difficult to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts." Accordingly, it permits witnesses "to testify to their personal perceptions in the form of inferences or conclusory opinions." Fulton, supra at 291-292.

However, a witness's particularized knowledge must "provide a truly rational basis for his or her opinion," a basis that does not stray into the realm of expert testimony. See, Asplundh, 57 F.3d at 1201. See also. Hirst v. Inverness Hotel Corp., 544 F.3d 221, 227, 50 V.I. 1122 (3d Cir. 2008) ("a party simply may not use Rule 701 as an end-run around the reliability requirements of Rule 702). While expert testimony "results from a process of reasoning which can be mastered only by specialists in the field," **FRE 701[c]** demands that lay testimony be grounded on "process[es] of reasoning familiar in everyday life."). See, Notes to 2000 Amendments (quotations and citations omitted); See also, United States v. Garcia, 413 F. 3d 201, 215 (2d Cir. 2005) ("[i]n

considering the third prerequisite for lay opinion testimony, a court must focus on the 'reasoning process' by which a witness reached his proffered opinion"). See, <u>Acosta v. Cent. Laundry, Inc.</u>, 273 F. Supp. 553 (E.D. Pa. 2017).

**FRE 701[c]** demands that lay testimony be grounded on "process[es] of reasoning familiar in everyday life." <u>Id</u>. See, <u>Asplundh</u>, supra at 1199. If the "rationale basis" grounding a lay opinion would prove inaccessible to "a person of average intelligence", it will not qualify as lay testimony. <u>Id</u>., See, <u>United States v. Kale</u>, 445 Fed. App's 482, 485 (3d. Cir. 2011). Thus, even testimony otherwise admissible under **FRE 701(a)** may be barred by **FRE 701[c]**. See, <u>Asplundh,</u> supra at 1199. In <u>Asplundh,</u> supra the court found "technical matters of a product defect or causation" sufficiently speculative and complex to require that a witness be qualified as an expert under **FRE 702**, therefore foreclosing lay opinion testimony under **FRE 701**. "Such technical testimony though perhaps based on a witness's particularized knowledge of a technical or specialized subject, nevertheless too closely resembles the sort of complex, hypothetical speculation characteristic of expert testimony. <u>Id</u>., at 1201. Accordingly, a trial court, in performing its judicial gatekeeping function, is required to exclude such specialized testimony unless the witness meets the expert qualification requirements of **FRE 702**. <u>Id</u>., at 1202. See, <u>Eichorn v. AT&T Corp.</u>, 484 F.3d 644 (3d Cir. 2007)(where proposed testimony required technical or specialized knowledge that crossed the line into areas that demanded expert testimony, lay opinion testimony in reliance on **FRE 701** was not permitted).

Here, Debtor's valuation report setting forth his opinion as to the value of Telemark CNC's assets subject to levy and auction at the Sheriff's sale, allegedly incorporated the "methodology" he applied in calculating his claim for surplus damages based on alleged communications with twenty-one (21) companies in applying fair market value for "continued use" contrary to the rule

of law in New Jersey, as set forth in <u>Smith</u>, supra, <u>MMU of New York</u>, *supra* and the line of cases that followed that applied the distressed value standard and not the standard adopted by Debtor. If Debtor had to engage in discussion with third parties to establish value, that means that the knowledge necessary for his to value the subject property was beyond his personal *perception* and required outside input, thereby placing his testimony outside the parameters of lay opinion testimony.

At his deposition, Debtor denied any history of purchasing machinery and equipment at auctions based on less than fair market value, thereby casting doubt on his experience in evaluating assets at forced liquidation value, which is critical to this case. Further, Debtor expressly acknowledged in his report that he relied on standards for valuation/appraisal set by the USPAP (Uniform Standards of Professional Appraisal Practices) and ASA (American Society of Appraiser), which criteria is highly specialized and requires a level of expertise far beyond the ken of the average person. See <u>Kale</u>, supra at 485. (If the "rational basis" grounding a lay opinion would prove inaccessible to "a person of average intelligence," it will not qualify as lay testimony).

The Debtor cannot use the lay opinion rule set forth in **FRE 701** as an end-run around the reliability requirements of **FRE 702** to present *expert testimony* through the guise of *lay opinion testimony*. As noted above, such testimony, even if it could be admissible under **FRE 701(a),** is barred by application of **FRE 701[c]**, which prohibits lay opinion testimony based on scientific, technical or other specialized knowledge. See, <u>Asplundh,</u> supra at 1199. Therefore, the Debtor, having elected to apply the specialized requirements of USPAP and ASA for purposes of his report, and engaging in communications with twenty-one (21) other companies to solicit their input as to valuation, cannot now disregard same to shortcut the requirements for expert testimony

set forth in **FRE 702** to testify pursuant to the lay opinion rule under **FRE 701**. Thus, Debtor is limited herein solely to his efforts to qualify as an expert in accordance with **FRE 702** and is not entitled to avail himself of the lay opinion rule set forth in **FRE 701**.

**D.** **SUMMARY AND CONCLUSION**

The Debtor's valuation "appraisal" report, should be excluded because:

▪ It will not assist the trier of fact;

▪ It is not proffered by an unbiased witness qualified as an expert by knowledge, skill, experience, training or education as it pertains to valuation of the subject personal property;

▪ It is not reliable;

▪ It is not based on reliable facts or studies;

▪ The allowance of the introduction of such "evidence" would be unfairly prejudicial, confusing and generally an undue waste of time pursuant to Federal Rule of Evidence 403.

In furtherance of the Kumho Tire responsibilities of this Court as to its "gate keeping" obligation, the Debtor's "report" is just the sort of "junk science" that Kumho Tire meant to exclude from consideration by the Courts. The "gate keeping" obligation of the Court is to ensure that the expert evidence proffered be based on reliable and generally accepted methods of conducting such analyses, or is barred from consideration as "a waste of time." See for example:

▪ In re Reynolds, 193 B.R. 195, 204 (D.N.J. 1996) (Bankruptcy Court's refusal to qualify expert appraiser affirmed where *proposed appraiser had no experience in appraising the subject collateral*);

▪ In re Spatz, 222 B.R. 157 (N.D.Ill. 1998) (Bankruptcy Court's disqualification of testimony of Chapter 7 Trustee's expert, concerning valuation of real estate, was proper where,

*although the expert had extensive training, education and experience in evaluating businesses, her real estate valuation background was lacking*; only about one third of 130 business valuations that the expert had performed involved predominately real estate, and, of those, in three out of four instances the expert had obtained valuation for real estate from a real estate appraiser);

▪ In re Iridium Operating, LLC, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) (experts disregard for methodology advocated by valuation authorities and typical practice in investment banking and academia shows that his opinions respecting Debtor's solvency and adequacy of capitalization, in the context of fraudulent and preferential transfer claims, *are not the product of reliable principles and methods* for purposes of determining admissibility of expert's testimony.);

▪ In re WorldCom, Inc., 371 B.R. 33 (Bankr. S.D.N.Y. 2007) (economist *with no prior experience in telecommunications industry or in telecommunications sales practices,* and whose testimony regarding the reasonableness of commission rate for party allegedly instrumental in telecommunication companies obtaining contract to sell prepaid telephone cards was not qualified to give expert opinion on reasonableness of commission rate);

▪ In re Doctors Hospital of Hyde Park, Inc., 360 B.R. 787 (Bankr. N.D.Ill. 2007), opinion supplemented, 373 B.R. 53 (Bankr. N.D.Ill. 2007) (economist's report identifying reasons for Debtor- hospital operator's insolvency did not qualify as expert opinion on issues of insolvency where economist based his conclusions on inquiry whether reasons for bankruptcy were *not done pursuant to industry standard*);

▪ In re Nellson Nutraceutical, Inc., 356 B.R. 364 (Bankr. D.Del. 2006) (valuation expert's methodology for determining enterprise value of Chapter 11 Debtors' business under a discounted cash flow analysis, in calculating the terminal value of business by subtracting

Debtors' capital expenditures from their earnings before EBITDA *was not sufficiently reliable* to permit receipt of expert's testimony on enterprise value of business).

In sum, the Debtor uses misleading and unreliable information upon which to leap to unsupportable and improbable conclusions which he has included in a report which is biased and shamelessly self-serving. Accordingly, the Debtor's report and opinion testimony must be stricken and/or excluded from consideration at trial for the reasons set forth above.

Respectfully submitted,

**WASSERMAN, JURISTA & STOLZ, P.C.**
Attorneys for Creditor Robert M Pietrowicz

By: _/s/   Leonard C. Walczyk_ .
     LEONARD C. WALCZYK

**FLASTER LAW GROUP**
Attorney for Creditor Robert M. Pietrowicz

By: _/s/   Neal H. Flaster_ .
     NEAL H. FLASTER

Date:  July 10, 2020