| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>Caption in Compliance with D.N.J. LBR 9004-2(c)<br>**WASSERMAN, JURISTA & STOLZ, P.C.**<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Phone: (973) 467-2700<br>Fax: (973) 467-8126<br>Co-Counsel for Robert M. Pietrowicz, Creditor<br>**LEONARD C. WALCZYK**<br><br>**FLASTER LAW GROUP**<br>30 Columbia Turnpike, PO Box 21<br>Florham Park, NJ  07932<br>Phone:  (973) 822-7900<br>Fax:  (973) 822-7923<br>Co-Counsel for Robert M. Pietrowicz, Creditor<br>**NEIL H. FLASTER** |
| In Re:<br><br>**WILLIAM CHARLES HOVEY,**<br><br><br><br>                                          Debtors. |

Chapter 13

Case No. 19-28149

Honorable Rosemary Gambardella

**Hearing Date:**  August 5, 2020, 10:00 a.m.

---

### CERTIFICATION OF COUNSEL IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE AND/OR STRIKE DEBTOR'S VALUATION REPORT AND ALL TESTIMONY BY DEBTOR REGARDING SAME

---

**TO THE HONORABLE ROSEMARY GAMBARDELLA**
**UNITED STATES BANKRUPTCY JUDGE**

I, Neal H. Flaster, of full age, do hereby certify in lieu of affidavit, as follows:

1. I am an attorney at law of the State of New Jersey and a Member of the Law Offices of Neal H. Flaster, LLC. In that capacity, I am co-counsel for Creditor, Robert M. Pietrowicz ("Pietrowicz") in the above captioned matter and am authorized to submit this

Certification in support of Creditor Pietrowicz's Notice of Motion to exclude and/or strike Debtor's fair market valuation report and all testimony by the Debtor regarding same in relation to the Debtor's Objection to the claim of Creditor Pietrowicz [Docket Nos. 33 and 35].

2. Annexed hereto as Exhibit "A" is a copy of the fair market valuation report filed by Debtor, William C. Hovey ("Debtor" or "Hovey") filed with the Court on May 4, 2020 [D No. 51]. Annexed hereto as Exhibit "B" is the three page Curriculum Vitae of the Debtor attached as part of Docket No. 51, also filed on May 4, 2020. Annexed hereto as Exhibit "C" is a two page Resume by the Debtor received in subpoenaed discovery in this case from his employer, BAE Systems, Inc.

3. Here, the Debtor elected not to retain an independent expert to conduct a valuation of the assets of Telemark CNC, LLC ("Telemark CNC") and the Debtor, individually, that were subject to levy and auction conducted by the Morris County Sheriff's Office on August 16, 2019. Rather, the Debtor prepared and filed his own report valuing the assets in question in alleged reliance *inter alia,* on his own experience and alleged consultations and communications with various companies beyond the scope of his personal knowledge. However, there is no documentation annexed to Debtor's report corroborating these alleged consultations/ communications. Further, although Debtor claimed in his report that the machinery and equipment sold at auction to Creditor Pietrowicz at the August 16, 2019 Sheriff's sale was in "proper operating condition" for fair market value calculation purposes, no proof was submitted with Debtor's report that he actually inspected the machinery and equipment and prepared written reports to confirm their condition.

4.   On May 15, 2020, I deposed the Debtor seeking to, among other things, solicit testimony from him as to: a) the methodology he employed in his valuation report; and b) based on his *curriculum vitae,* the extent of his experience and knowledge to testify as to his appraisal/valuation of Telemark CNC's property sold to Creditor Pietrowicz at the August 16, 2019 Sheriff's sale.  A true copy of the deposition mini transcript is annexed hereto as Exhibit "D".

5.   At his deposition, I asked the Debtor why he chose to value Telemark CNC's assets sold at the Sheriff's Sale at "fair market value".   He responded, stating that:

> "I chose fair market value because at the time that this appraisal is representing, the equipment was in proper operating condition and I chose to market -- excuse me, to appraise it at fair market value to represent the fair value of the equipment."

See, Transcript at page 23, line 20 through page 24, line 2.

6.   I asked the Debtor why he chose not to bid at the Sheriff's sale which took place on August 16, 2019.  He responded, stating that:

> "That's personal reasons.  I -- I -- you know, limited funds.  There is a lot of reasons. Emotional.  I don't have a clear answer for you on that one.  I'm not even sure".

See, Transcript at page 24, line 19 through page 25, line 5.

7.   I asked Debtor whether he took any legal action through the Courts to stop the sale of assets of Telemark CNC's and himself, individually, after the Sheriff's Office refused to grant an adjournment request. He responded, stating "I don't recall."  See, Transcript at page 26 lines 9 through 18.  This Court should take notice that on July 31, 2019, just two weeks prior to the date of the Sheriff's sale, the Debtor filed an emergent application before the Superior Court of New Jersey, Appellate Division under Docket No.: A-003832-18 for leave to file an emergent

3

appeal to *inter alia*, vacate the November 16, 2019 Judgment against him, individually and his wholly owned company, Telemark CNC (See Exhibit "E", annexed hereto).

8.  However, on August 1, 2019, the Appellate Division rejected Debtor's emergent application, stating that: 1) the timing of the application suggested that the emergency was self-generated; and 2) Defendants (e.g., Hovey and Telemark CNC) were unlikely to demonstrate that they were entitled to obtain injunctive relief (See Exhibit "F", annexed hereto).

9.  I asked the Debtor at his deposition on May 15, 2020 whether he was present at the time of Creditor Pietrowicz's sale of Telemark CNC's assets acquired at the Sheriff's Sale. He responded, stating that he did not recall attending any such auction. See, Transcript at page 30, line 17 through page 31, line 5.

10. I asked the Debtor whether he attended any auction sales to buy equipment when he was operating Telemark CNC to establishing whether he experience in purchasing at such sales. He responded, stating that he did not recall ever buying equipment or machines at an auction sale while Telemark CNC was in business. See, Transcript page 31 lines 1 through 9. I asked the Debtor whether he recalled going to auction sales to buy machinery and equipment for Telemark CNC for significantly less than fair market value and he responded, stating that: "I don't recall." The Debtor testified that he did not recall ever paying more than fair market value at an auction sale. The Debtor acknowledged that when he was in business with creditor Pietrowicz (in connection with their jointly owned business, Telemark Holdings, LLC which was a party to the state court action), he recalled going to auction sales with Mr. Pietrowicz to buy machinery and equipment, but could not recall whether he bought machinery and equipment at these sales for (significantly) less than fair market value. See, Transcript page 31, lines 1 through 25 to page 32, lines 1 through 5.

4

11. I asked Debtor questions about his Curriculum Vitae (Exhibit "B"). Specifically, I questioned him as to the significance of "Six Sigma Certification", which is prominent throughout his Curriculum Vitae. He responded, stating that the "Six Sigma Certification" is awarded after a fourteen month training program for engineers and operational personnel to be trained in advanced statistics, applied statistics, and problem solving. He added that once he obtained the certificate, the Debtor could then train and certify other operational experts on "continuous improvement in many different forms of industry". See, Transcript, Page 34, lines 9 through 25. However, the Debtor failed to demonstrate any nexus between training required to obtain a Six Sigma Certification and training associated with appraisals of machinery, equipment, parts, materials, inventory, or other business assets.

12. I asked the Debtor about the last paragraph of his Curriculum Vitae, which stated that the Debtor provided numerous consultations to executives as to the valuation of factory and engineering level computer systems, machines and equipment, and that he personally provided valuation consultations of businesses for acquisition purposes. The Debtor acknowledged that none of the "valuation consultations" were attached as exhibits to his report. See, Transcript page 36, line 2 through page 39, line 2.

13. I asked the Debtor whether he was certified as an appraiser and he admitted that he was not certified and that he could not recall taking any classes in appraisals. See, Transcript page 40, line 18 through page 41, line 15.

14. I asked the Debtor for the names of the companies and the dates of his valuation consultations referenced in paragraph 10 above. The Debtor responded, stating that he could not recall the company names or dates of valuations. See, Transcript page 42, lines 3 through 11.

5

15. I asked the Debtor what personal assets were on site at Telemark CNC based on his valuation report which claimed that both personal and business assets of Telemark CNC were the subject of the Sheriff's Sale. The Debtor responded, stating that he could not recall. See, Transcript page 42, line 22 through page 43, line 8.

16. I asked the Debtor about his claim that that "all operations, equipment, machines at the premises of Telemark CNC were fully functional and operational in the normal course of business without restrictions" [see page 2 of appraisal report annexed as Exhibit "A"] and whether he had an inventory listing or other documentation to substantiate his claim and he responded: "No". See, Transcript page 50, line 20 through page 51, line 8. Debtor failed to provide written corroboration in his report to support his claim that he examined all "operations, equipment and machines" to confirm their functionality and operation. I asked Debtor whether his valuation report annexed hereto as Exhibit "A", was an "expert" report. He responded, stating:

> "A. Is it an expert report from me? Is that the question?
>
> Q. Yes.
> A. It's a report. It's my report. It's my valuation report. I don't think I'm in a position to say what it qualifies as. I think that's up to a court to decide."

See, Transcript page 53, line 20 through page 54, line 15.

17. I asked the Debtor about the statement in his "appraisal" that the methodology he used in valuing Telemark CNC's assets was in accordance with USPAP ("Uniform Standards of Professional Appraisal Practice") guidelines. I asked him for the specific USPAP guidelines and code sections that he relied upon in his valuation and he responded, that he "did not recall the specific USPAP guidelines for fair market value" and that he was unable to provide a specific

6

reference number or code number to support his claim. See, Transcript, Page 71, line 2 through page 72, line 15.

18. The 2020-2021 USPAP standards reject any valuation/appraisal based on the bias of an appraiser who is not objective and/or who has a pecuniary and/or financial interest in the result. See, Exhibit "G", annexed hereto. The preamble to the USPAP standards mandate that compliance is required when either the service or the appraiser is obligated to comply by law, regulation, or by agreement with the client or intended users. Similarly, the USPAP Ethics Rule states that an *individual* should comply at any time that the person represents that he or she is performing the service as an appraiser. See, Exhibit "H", annexed hereto.

19. Under the USPAP standards, an appraiser is expected to perform valuation services competently in a manner that is independent, impartial and objective. Similarly, USAP Advisory Opinion 21 requires that any person "acting as an appraiser" is expected to provide such service in an independent, impartial and objective manner consistent with the ethics requirements of the USPAP. See USPAP Advisory Opinion 21. Thus, an individual, such as the Debtor, who agrees to perform a valuation service has a duty to comply with the USPAP standards for ethics and competency which the public expects from an appraiser and that no valuation should be issued by anyone who is biased or has a pecuniary interest in the result. See, USPAP Advisory Opinion 21, annexed hereto as Exhibit "I".

20. Debtor's certification accompanying his valuation report does not comply with USPAP requirements. See Exhibit "J", annexed hereto.

21. I asked Debtor whether he used alternative methodologies other than replacement value in valuing the assets in issue. He responded, stating that he took into account only fair market value for purposes of his valuation. When asked whether he considered liquidation value,

7

Debtor stated that he did not "because it would be contradictory to take two different valuations at the same time." However, the Debtor acknowledged that in valuing the assets he was obliged to look at more than just fair market value. See, Transcript page 76, line 16 through page 77, line 9.

22. I asked Debtor about a valuation report dated June 30, 2016 prepared by MRV Valuation Consulting, LLC ("MRV"), an expert witness retained by the Debtor in connection with the underlying state court action between the Debtor and Creditor Pietrowicz in which MRV contested the valuation, *inter alia* of machinery and equipment by the Court appointed expert, Francis Brunelle. The MRV report criticized the conclusions reached by Ms. Brunnelle because she failed to make independent assessments of **each** asset subject to valuation in favor of an **overall** general statement of the condition of the assets. See, Transcript page 82, line 7 through page 83, line 16. See also, Exhibit "K", annexed hereto.

23. In the Debtor's report annexed hereto as Exhibit "A", at page 3, the Debtor stated that in reaching his valuation determination, he took into account the guidelines for "Fair Market Valuation" for "continued use" in accordance with the ASA (American Society of Appraisers) standards for valuing Machinery and Equipment. At his deposition, the Debtor testified that he did not rely on the book entitled, "*Valuing Machinery and Equipment, the Fundamentals of Appraising Machinery and Technical Assets, Third Edition*", which MRV relied upon in its June 30, 2016 report. Rather, the Debtor testified he relied upon the guidelines set forth in the book entitled "*Valuing Machinery and Equipment from the American Society of Appraisers*", which is the updated fourth edition of the earlier title. See Transcript, Page 89, line 10 through page 90, line 10. Nonetheless, the definition of continued use is identical in both the third and fourth editions. (See Exhibit "L", annexed hereto)

8

24. I asked the Debtor what was the basis for his opinion that the machinery and equipment sold at auction to Creditor Pietrowicz would *continue in use* following transfer of title at the Sheriff's Sale. The Debtor responded, stating that he did not rely on any facts assuming there would be continuation of use beyond September 4, 2019. See, Transcript page 103, line 4 through page 104, line 12. In establishing a date for "continuation in use", the Court should take notice that Debtor's most recent filing of his Amendment to his Bankruptcy Petition acknowledged that Telemark CNC ceased operation on August 16, 2019, the date of the Sheriff's Sale. Thus, there is no basis to conclude that there was any "continuation of use" beyond the August 16, 2019 date of the Sheriff's sale.

25. Debtor admitted at his deposition that he used a cost approach in valuing the equipment, operations, and raw material as if he was valuing an ongoing business, taking into consideration cost factors such as burn rate, insurance, and overhead, etc. Debtor also admitted that he did take into consideration the condition of the equipment, depreciation or obsolescence in valuing same, because he "didn't use the cost approach". Transcript page 13, lines 9 through 25.

26. Debtor testified at his deposition that that he believed liquidation value could, in certain circumstances, be greater than fair market value. See, Transcript page 118, lines 1 through 25.

27. Beginning at page 194 through page 198 of the transcript of Debtor's deposition testimony, he described in detail the individuals he contacted to supplement Debtor's personal knowledge as to the value of Telemark CNC's assets. However, Debtor's consultation with other alleged valuation professionals does not transform the Debtor into an expert on the subject (See, Fed.R.Civ.P. 702, witness must be first be qualified as an expert by knowledge, skill, experience

9

training or education). An unqualified expert is not permitted to reply on the opinions of others who did not submit expert reports, as doing so would allow the disclosed purported expert to serve as a mouthpiece for someone else. Courts routinely reject attempts to admit opinions of an undisclosed experts "through a non-qualified mouthpiece". H&M Oil & Gas, LLC, 511 B.R. 408, 4116 (Bankr. N.D.Tex. 2014); Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F.Supp. 2d 794, 808 (N.D.Ill. 2005) ("The problem, then, is that the expert is vouching for the truth of what another expert told him - he is merely that expert's spokesman. But, 'a scientist' however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

28. After 400 pages of testimony, in which I asked the Debtor approximately 200 questions o various subjects, at page 243 of the transcript, I asked him about his $1,440,000.00 valuation of Telemark CNC's assets listed in his report. Mr. Hovey responded, stating that "Well, if I had an opportunity to sell it, but I don't have that opportunity anymore, I might have sold everything for more than that, maybe $2 million. I don't know." See, Transcript page 244, at lines 6 through 9. I asked the Debtor, "… Mr. Hovey, if you thought the business was worth $2 million, and you got a $585,000 judgment, why didn't you just simply sell the business, pay off Mr. Pietrowicz, and keep the difference for yourself and your family?" The Debtor replied, "Because I had a court order constraining me from selling anything. You should remember that." See, Transcript page 244, line 10 through page 245, line 22.

29. I asked Debtor why he did not solicit offers to sell and he responded, stating that he was under the impression he was prohibited from "selling the business". See, Transcript page 248, lines 5 through 20. The Debtor could not identify any specific Order in the underlying state

10

litigation that prohibited his ability to sell Telemark CNC or its contents to satisfy Creditor Pietrowicz's judgment.

30. Based on the Debtor's deposition testimony and attached exhibits, he is not qualified to testify as an expert as his valuation report and the opinions contained therein are unreliable. Moreover, the Debtor's conclusory report constitutes an impermissible net opinion as to the value of Telemark CNC's contents, due to *inter alia*, the Debtor's failure to disclose discussions and communications he undertook for purposes of rendering his report, together with unsubstantiated inspections of Telemark CNC's machinery and equipment that Debtor claims he undertook to confirm the conditions of Telemark CNC's assets subject to levy and sale but never produced with his report.

31. Creditor Pietrowicz incorporates by reference the expert report of Alan Atkins, setting forth his appraisal and valuation of the assets of Telemark CNC in issue, together with documents annexed thereto confirming the "commercially reasonable" sale of the levied assets acquired at the August 16, 2019 Sheriff's sale by Mr. Pietrowicz (Docket entry No. 47).

I hereby certify that the foregoing statements made by me are true and correct, and that the attached exhibits are true copies of the originals. I make such statements knowing that the Court shall act in reliance upon same and that if any of the above statements are willfully false, I am subject to punishment.

s/Neal H. Flaster

_____

Neal H. Flaster, Esq.

Dated:

S:\8584 William Charles Hovey\Motion to Exclude Debtor's Valuation\Certification of Cousnel in Support of Motion.doc